**Joel PENTLARGE and Edward Given, Plaintiffs,**

v.

**Robert MURPHY, et al., Defendants.**

**Civil Action No. 01cv11099–NG.**

United States District Court, D. Massachusetts.

March 31, 2008.

Hilary B. Dudley, Joshua W. Gardner, John A. Houlihan, Edwards Angell Palmer & Dodge LLP, John G. Swomley, Swomley & Associates, Boston, MA, Harry L. Miles Green, Miles, Lipton, White & Fitz–Gibbon, Northampton, MA, for Plaintiffs.

Brian P. Mansfield, Department of Corrections, Mary P. Murray, Department of Corrections, Legal Division, Bridgewater, MA, Kevin W. Mulvey, Mulvey Sneider & Freyman LLP, Chestnut Hill, MA, for Defendants.

## MEMORANDUM AND ORDER RE: MOTION TO DISMISS

NANCY GERTNER, District Judge.

The Court hereby **ADOPTS IN PART** and **DECLINES TO ADOPT IN PART** the Report and Recommendations of the Magistrate Judge (document # 148).[1] The Court adopts the entirety of the Report and Recommendations, with the important exception of the section relating to the plaintiffs' allegations, contained in Count III of the Second Amended Complaint (document # 107), that the defendants have violated their rights under the Fifth Amendment. The plaintiffs here were civilly committed to the Nemansket Correctional Center ("Treatment Center") in Bridgewater, Massachusetts, as sexually dangerous persons ("SDPs") pursuant to M.G.L. c. 123A. For the reasons set forth below, the Court finds that the plaintiffs' allegations sufficiently plead a violation of the Fifth Amendment, namely that civil detainees are required to waive all rights to confidentiality as a condition of receiving treatment and that information shared in the treatment setting may be communicated to the District Attorney's Office and used in subsequent criminal prosecutions. The Court further holds that the plaintiffs may not maintain an action for damages, as the defendants are entitled to qualified immunity. Thus, defendants' Motion to Dismiss (document # 115), insofar as it relates to the Fifth Amendment claim contained in Count III, is **GRANTED IN PART** as to plaintiffs Joel Pentlarge and Edward Given's claims for damages.

Plaintiff Edward Given, who remains detained at the Treatment Center, may seek injunctive relief. As such, the defendants' Motion to Dismiss is **DENIED IN PART** as to Given's Fifth Amendment request for equitable relief.

In their Memorandum in Support of Motion to Dismiss (document # 117), defendants argued, inter alia, that the Supreme Court's decision in *McKune v. Lile*, 536 U.S. 24, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002)—a case involving a sex offender treatment program administered in Kansas prisons—compels dismissal of plaintiffs' Fifth Amendment claim here. (*Id.* at 32–33, 122 S.Ct. 2017.) The Magistrate Judge agreed, writing:

> The fact that an *inmate* may face some consequences for not disclosing his past sexual history does not rise to the level of unconstitutional compulsion where the 'consequences an *inmate* faces for not participating are related to the program objectives and do not constitute atypical and significant hardships in relation to the ordinary incidents of [Treatment Center] life.'

(Rep. & Rec. 33–34 (quoting *McKune*, 536 U.S. at 37–38, 122 S.Ct. 2017 (plurality opinion)) (alteration in original) (emphasis added).) In doing so, the Magistrate Judge adopted the reasoning of Justice Kennedy's plurality opinion in *McKune*, which, in turn, looked to *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), for guidance in defining what constitutes "compulsion" under the Fifth Amendment in prisons.

Before evaluating the sufficiency of plaintiffs' pleadings, the Court wishes to address the Magistrate Judge's application of *McKune*—and specifically the plurality opinion—to the context of civil commit-

---

**1.** The Court notes that the Magistrate Judge's Report and Recommendations provides an ex-

cellent summation of the facts; thus, there is no need to rehash those facts here.

ments. *McKune* involved a Fifth Amendment challenge to the Kansas Department of Corrections Sexual Abuse Treatment Program ("SATP"), a program designed to rehabilitate sex offenders serving criminal sentences. As part of the program, inmates were required to complete and sign an "Admission of Responsibility" form as well as a detailed history of their past sexual activities, regardless of whether the activities constituted uncharged criminal offenses. *McKune*, 536 U.S. at 30, 122 S.Ct. 2017 (plurality opinion). Theoretically, information obtained during treatment could then be communicated to law enforcement authorities, who, in·turn, could use the information in future criminal prosecutions. *Id.* Inmates ·refusing to complete the required forms were prohibited from participating in the treatment program and faced various reductions in prison privileges. *Id.* at 30–31, 122 S.Ct. 2017.

The Court upheld the program against a Fifth Amendment challenge. Justice Kennedy, writing for himself and three other justices, equated the Fifth Amendment inquiry to the due process analysis in *Sandin*. *McKune*, 536 U.S. at 38, 122 S.Ct. 2017 (plurality opinion). Employing the *Sandin* standard, he suggested that the consequences attached to a prisoner's refusal to waive his Fifth Amendment rights would only constitute "compulsion" where they represented "atypical and significant hardships in relation to the ordinary incidents of prison life." *Id.*

Justice O'Connor, while concurring in the result, rejected the plurality's reliance on *Sandin*, stating that she believed "that the Fifth Amendment compulsion standard is broader than the 'atypical and significant hardship' standard we have adopted

for evaluating due process claims in prisons." *Id.* at 48, 122 S.Ct. 2017 (O'Connor, J., concurring in judgment). She nonetheless rejected the notion that "the alterations·in respondent's prison conditions as a result of his failure to participate in the [SATP] were so great as to constitute compulsion for the purposes of the Fifth Amendment privilege against self-incrimination."[2] *Id.* at 48–49, 122 S.Ct. 2017 (O'Connor, J., concurring in judgment). She added, however, that the imposition of other negative consequences, such as longer terms of incarceration, "as a penalty for refusing to incriminate oneself would surely implicate a 'liberty interest.' " *Id.* at 52, 122 S.Ct. 2017.

Reliance on the plurality opinion in *McKune* in the instant cases is misplaced for two reasons: First, the First Circuit has clearly held that "Justice O'Connor's narrower position in her concurrence represents the holding of the [case]." *Ainsworth v. Stanley*, 317 F.3d 1, 4 (1st Cir. 2002) (internal quotation marks omitted) (quoting *Reed v. McKune*, 298 F.3d 946, 952 (10th Cir.2002)). Second, and crucially, even taking Justice Kennedy's plurality opinion on its own terms, *McKune* is fundamentally distinguishable from the instant case in that an "essential" component of the *McKune* plurality's reasoning relied on the fact that the plaintiffs in that case were serving punitive prison sentences, *McKune*, 536 U.S. at 36, 122 S.Ct. 2017 (plurality opinion); here, the plaintiffs are detained on ostensibly non-punitive civil commitments. The Court takes this opportunity to address this second reason at greater length below.

Justice Kennedy, writing for the *McKune* plurality, noted that "[t]he fact

2. "In practical terms, these changes involve restrictions on the personal property respondent can keep in his cell, a reduction in his visitation privileges, a reduction in the

amount of money he can spend in the canteen, and a reduction in the wage he can earn through prison employment." *Id.* at 50–51, 122 S.Ct. 2017.·

that the[ ] consequences [here] are imposed on prisoners, rather than ordinary citizens ... is important in weighing respondent's constitutional claim." *Id.* He went on to observe that "the fact of a valid conviction and the ensuing restrictions on liberty are essential to the Fifth Amendment analysis.... A broad range of choices that might infringe constitutional rights in free society fall within the expected conditions of confinement of those who have suffered a lawful conviction." *Id.; see also id.* at 40, 122 S.Ct. 2017 (criticizing "respondent [for] treat[ing] the fact of his incarceration as if it were irrelevant."); *cf. Kansas v. Hendricks,* 521 U.S. 346, 361–64, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) (contrasting civil commitment with imprisonment for committing a crime). In light of these considerations, the plurality looked to *Sandin* for guidance in establishing the contours of what constitutes "compulsion" for purposes of the Fifth Amendment in the prison context.[3] *McKune,* 536 U.S. at 37–38, 122 S.Ct. 2017 (plurality opinion).

Given that Justice Kennedy's plurality opinion was, in the eyes of four justices, "a watershed" departure from the Court's precedents that could ultimately cause "the evisceration of a constitutional right," *McKune,* 536 U.S. at 54, 122 S.Ct. 2017 (Stevens, J., dissenting), courts should be reticent to untether the plurality's methodology—to the extent that it is controlling at all—from its original context, the prison setting. This distinction is crucial. The application of the *Sandin* framework to the context presently before the Court would represent a dangerous blurring of the line between criminal incarceration and civil commitment.[4] *See Youngberg v. Romeo,* 457 U.S. 307, 321–22, 102 S.Ct. 2452,

73 L.Ed.2d 28 (1982) ("Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminal whose conditions of confinement are designed to punish."); *cf. Hydrick v. Hunter,* 500 F.3d 978, 991 (9th Cir.2007) ("As is the case with prisoners, civilly committed persons retain those First Amendment rights not inherently inconsistent with the circumstances of their detention.").

Thus, rather than look to the *McKune* plurality opinion and its reliance on *Sandin,* this Court looks to the traditional line of Fifth Amendment cases as Justice O'Connor did in her concurrence. The Fifth Amendment's privilege against self-incrimination, which applies to the states via the Fourteenth Amendment, provides that no person "shall be compelled in any criminal case to be a witness against himself." The privilege

> not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also 'privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.'

*Minnesota v. Murphy,* 465 U.S. 420, 426, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984) (quoting *Lefkowitz v. Turley,* 414 U.S. 70, 77, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973)). A person "protected by the privilege may rightfully refuse to answer unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant." *Tur-*

---

3. The Court notes that the rule in *Sandin* was motivated by a desire to "afford appropriate deference and flexibility to state officials trying to manage a volatile environment" and deal with issues of inmate and prison staff safety. 515 U.S. at 482, 115 S.Ct. 2293.

4. This blurring is precisely what is at issue in the rest of the plaintiffs' complaint.

*ley,* 414 U.S. at 78, 94 S.Ct. 316 (citations omitted).

Outside of the prison context, the Supreme Court has "described compulsion in relatively broad terms." *Ainsworth v. Risley,* 244 F.3d 209, 213 (1st Cir.2001), *vacated on other grounds,* 536 U.S. 953, 122 S.Ct. 2652, 153 L.Ed.2d 829 (2002). The Court has held that "certain types of penalties are capable of coercing incriminating testimony," including: termination of employment, the loss of a professional license, ineligibility to receive government contracts, and the loss of the right to participate in political associations and to hold public office. *McKune,* 536 U.S. at 50, 122 S.Ct. 2017 (O'Connor, J., concurring in the judgment) (citing, respectively, *Unif. Sanitation Men Ass'n, Inc. v. Comm'r of Sanitation of N.Y.,* 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968); *Spevack v. Klein,* 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967); *Lefkowitz v. Turley,* 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973); and *Lefkowitz v. Cunningham,* 431 U.S. 801, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977)). In *Cunningham,* the Court specifically "rejected the notion that citizens may be forced to incriminate themselves because it serves a governmental need," adding that the interests of the state, even if compelling, do not "justify infringement of Fifth Amendment rights." 431 U.S. at 808, 97 S.Ct. 2132. These cases quite rightly define "compulsion" as anything that makes the exercise of the right "costly." *Spevack,* 385 U.S. at 515, 87 S.Ct. 625.

In the instant case, the plaintiffs allege that civil detainees committed pursuant to M.G.L. c. 123A are required to waive all rights to confidentiality as a condition of receiving treatment at the Treatment Center. Specifically, the informed consent form that civil detainees are asked to sign makes clear that "treatment records may be reviewed by District Attorneys ... for court proceedings under M.G.L. Chapter 123A" and that "there is *no* expectation of confidentiality." [5] (Exh. B to Pls. Mem. in Opp. (document # 121–4) (emphasis added).) The form, however, contains no grant of immunity or guarantee that information obtained in treatment and shared with the District Attorney's Office will not be used to any future criminal prosecutions.[6] This clearly raises the possibility that SDPs will be required "to answer official questions" in a "proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Murphy,* 465 U.S.

---

5. The Court may consider "documents the authenticity of which are not disputed by the parties; ... documents central to *plaintiff's* claim; [and] documents sufficiently referred to in the complaint." *Chmielinski v. Massachusetts,* 513 F.3d 309, 311 n. 1 (1st Cir.2008) (citations and quotations omitted).

6. It should be noted that the compulsion alleged here would violate the plaintiffs' Fifth Amendment rights only to the extent that any statements made could be used in criminal proceedings against the plaintiffs. It is, of course, the privilege against *self-incrimination* that is the object of the Fifth Amendment's protection. Plaintiff Given has submitted a document entitled "Forensic Health Services Sex Offender Treatment Achievement Matrix," which seems to indicate that one of the steps in the treatment process requires SDPs to disclose "additional sexual offenses not on record." (Exh. 1 to Pl. Obj. (document # 151–2).) While consideration of this document is not necessary to the Court's ruling here, it certainly suggests that successful completion of the treatment program turns at least in part on an SDP's admission of past uncharged offenses. The Court also notes that defendants have referenced this document in their Reply to plaintiffs' objections and have not disputed its authenticity. (Defs. Reply to Obj. 6 (document # 154).) As the First Circuit stated in *Ainsworth,* the state could avoid any tension with the Fifth Amendment by merely granting limited-use immunity to prisoners asked to disclose past wrongs. 317 F.3d at 5.

at 426, 104 S.Ct. 1136 (quoting *Turley,* 414 U.S. at 77, 94 S.Ct. 316).

■■■ Assuming plaintiffs' factual allegations to be true, as the Court must do here, defendants' actions plainly make it "costly" for SDPs to assert their Fifth Amendment rights.[7] The plaintiffs allege that "[t]he defendants refused to provide Mr. Pentlarge and refuse to provide Mr. Given with sex offender treatment" unless the plaintiffs waive their Fifth Amendment rights. (Complaint 8 (document # 107).) In the context of ch. 123A, the receipt of sex offender treatment is itself, to some extent, a constitutionally protected right.[8] *see Seling v. Young,* 531 U.S. 250, 265, 121 S.Ct. 727, 148 L.Ed.2d 734 (2001); *Youngberg,* 457 U.S. at 316, 322, 102 S.Ct. 2452; *Williams v. Nelson,* 398 F.Supp.2d 977, 987 (W.D.Wis.2005) ("Because the statute aims primarily to isolate and treat sex offenders, due process requires that the conditions and duration of plaintiff's confinement bear some reasonable relation to those purposes.").

As the Magistrate Judge notes, "a treatment program that amounts to no treatment at all ... cannot be reasonably related to the State's asserted interest in providing ... treatment and rehabilitation." (Rep. & Rec. 39 (citing *West v. Schwebke,* 333 F.3d 745, 749 (7th Cir. 2003))). By that same rationale, a program that provides treatment *if and only if* committed individuals relinquish their Fifth Amendment rights is similarly unconstitutional in that it imposes a cost—the loss of constitutionally guaranteed treatment—on the assertion of the right against self-incrimination.

Moreover, the withholding of treatment may pose a serious obstacle to SDPs seeking release from their civil commitment. Under the statute, SDPs are entitled to file yearly petitions for examination and discharge. M.G.L. c. 123A, § 9. The governing statute explicitly states "[u]nless the trier of fact finds that such person remains a sexually dangerous person, it shall order such person to be discharged from the treatment center." *Id.* While participation in sex offender treatment is not technically a prerequisite for petitioning for discharge under § 9, the statute clearly contemplates that treatment records will be an important factor in a court's decision whether to discharge an SDP. *See id.; see also id.* § 2 (citing "treatment and rehabilitation of persons adjudicated as being sexually dangerous" as a central objective of the statute).

If the mere fact of an SDP's refusal to waive confidentiality—thus risking self-incrimination—creates a practical impediment to his discharge, the requirement makes the exercise of the privilege against self-incrimination costly. *Cf. Hydrick,* 500 F.3d at 992 (holding that "where the stakes for participation in treatment are so high, the deprivations involved in [civilly

---

7. At a later stage in this litigation, the evidence may well show either that civil detainees are not in fact compelled to disclose past uncharged offenses as part of their treatment regimen or that the consequences that flow from an SDP's refusal to waive his Fifth Amendment privilege do not rise to the level of constitutional compulsion. At this stage, however, the plaintiffs have pleaded sufficient facts to make out a Fifth Amendment claim. *See Hydrick,* 500 F.3d at 992.

8. To be sure, the First Circuit has not explicitly held that civilly committed persons have a right to treatment per se. *See Cameron v. Tomes,* 990 F.2d 14, 19 (1st Cir.1993). Civilly committed persons do have a right to be confined in conditions that bear a reasonable relation to the purpose of the relevant commitment statute, *Seling,* 531 U.S. at 265, 121 S.Ct. 727, and ch. 123A makes clear that one of its primary purposes is treatment and rehabilitation. § 2 (treatment center are to provide for detainees' "care, custody, treatment, and rehabilitation.").

committed sexually dangerous predators] refusing to participate in treatment may rise to the level of compulsion that violates the First Amendment"); *Wolfe v. Penn. Dep't of Corr.*, 334 F.Supp.2d 762, 770–73 (E.D.Pa.2004) (allowing criminal inmate to proceed past pre-trial motions on First Amendment grounds where the right to parole was conditioned on participation in treatment). Thus, plaintiffs have pled sufficient facts to suggest that defendants present SDPs with an unconstitutional choice between self-incrimination or denial of rehabilitation that is essential to their release.

■ As such, the Magistrate Judge's recommendation that Count III be dismissed is rejected with respect to plaintiff Given's claim for equitable relief.[9] With respect to plaintiffs' claim for damages, however, the motion to dismiss is granted on the alternative ground of qualified immunity.[10]

The First Circuit employs a three-part procedure in order to determine whether a state actor is entitled to qualified immunity. The procedure requires this court to consider:

(i) whether the plaintiff's allegations, if true, establish a constitutional violation; (ii) whether the constitutional right at issue was clearly established at the time of the putative violation; and (iii) whether a reasonable officer, situated similarly to the defendant[s], would have understood the challenged act or omission to contravene the discerned constitutional right.

*Limone v. Condon*, 372 F.3d 39, 44 (1st Cir.2004). "Under ordinary circumstances, the development of the doctrine of qualified immunity is best served by approaching these inquiries in the aforestated sequence." *Cox v. Hainey*, 391 F.3d 25, 30 (1st Cir.2004).

As detailed above, the record establishes that the first prong of the analysis has been satisfied. Taking all allegations in the complaint as true and drawing all reasonable inferences in favor of the plaintiff, the pleadings could support a finding that the defendants, through their waiver policy, impermissibly burdened the plaintiffs' Fifth Amendment rights.

■ However, plaintiffs' damages claim must fail on the second prong of the qualified immunity analysis. Under this prong, the "existing case law [must give] the defendants 'fair warning that their conduct violated the plaintiff's constitutional rights.'" *Jennings v. Jones*, 499 F.3d 2, 16 (1st Cir.2007) (quoting *Suboh v. Dist. Attorney's Office of Suffolk*, 298 F.3d 81, 93 (1st Cir.2002)). Further, "the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." *Riverdale Mills Corp. v. Pimpare*, 392 F.3d 55, 65 (1st Cir.2004) (quoting *Wilson v. Layne*, 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)) (internal quotation marks omitted). Here, the relatively thin case law on sexual treatment programs is insufficient to put the defendants on notice that their waiver policy may have been

---

9. Pentlarge is no longer detained at the Treatment Center and is no longer subject to conditions or treatment. Thus, any request by Pentlarge for injunctive or declaratory relief is moot. *Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir.1985) and *Doe v. Mass. Dept. of Soc. Servs.*, 948 F.Supp. 103, 107 (D.Mass. 1996). The only claim available to Pentlarge now that he has been released is a claim for money damages against the individual defen-

dants acting in their individual capacities, to which the defendants may, and do, assert a qualified immunity defense.

10. Additionally, under 42 U.S.C. § 1983, money damages are unavailable against State officers acting in their official capacities. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

unconstitutional. Without prior cases holding that the practice of conditioning sex offender treatment on a waiver of Fifth Amendment rights is constitutionally infirm, the defendants cannot be held individually liable for money damages on this claim.

As stated above, the Court adopts the Magistrate Judge's Report and Recommendations (document # 148) in its entirety, with the exception of the section relating to the plaintiffs' allegations that the defendants have violated their rights under the Fifth Amendment. Thus, defendants' Motion to Dismiss (document # 115), insofar as it relates to the Fifth Amendment claim contained in Count III, is **GRANTED IN PART** as to plaintiffs Joel Pentlarge and Edward Given's claims for damages, but **DENIED IN PART** as to Given's request for equitable relief.

**SO ORDERED.**