COMMONWEALTH of Pennsylvania,
Appellee

v.

Jordan Anthony BROWN, Appellant.

Superior Court of Pennsylvania.

Argued Jan. 25, 2011.

Filed March 11, 2011.

Lourdes M. Rosado, Philadelphia, for appellant.

Christopher D. Carusone, Office of the Attorney General, Harrisburg, for Commonwealth, appellee.

BEFORE: ALLEN, OLSON, and COLVILLE,* JJ.

OPINION BY ALLEN, J.:

Jordan Anthony Brown ("Appellant"), a juvenile, appeals from the trial court's order denying his motion to decertify the criminal proceedings and transfer the case to the juvenile division. Appellant contends that the trial court committed an error of law in applying a provision of the decertification statute, 42 Pa.C.S.A. § 6355(a)(4)(iii), in a manner that infringed upon his Fifth Amendment rights against self-incrimination. Upon review, we conclude that the Fifth Amendment is applicable to decertification proceedings. We further conclude that the trial court's application of 42 Pa.C.S.A. § 6355(a)(4)(iii) violated (or, at least, needlessly chilled) Appellant's rights against self-incrimination. Accordingly, we vacate the trial court's order and remand for a new decertification hearing.

The relevant facts and procedural history of this case are as follows. On February 20, 2009, Appellant, who was 11 years old at the time, allegedly murdered Kenzie Marie Houk and her unborn baby. Houk was 26 years old and the fiancée of Appellant's father. Houk died of a single gunshot wound to the back of her head, and her unborn baby died due to lack of oxygen. The Commonwealth charged Appellant with homicide, 18 Pa.C.S.A. § 2501, and homicide of an unborn child, 18 Pa. C.S.A. § 2603, in the criminal division of the Court of Common Pleas.

On October 6, 2009, Appellant filed a petition pursuant to 42 Pa.C.S.A. § 6322(a) to transfer his case from the criminal division to the juvenile division. On January 29, 2010 and March 12, 2010, the trial court held hearings on the petition.

At the hearings, Appellant, *inter alia*, presented the expert testimony of Dr. Kirk Heilbrun, a clinical and forensic psychologist. Dr. Heilbrun administered several standard psychological tests on Appellant, and opined that Appellant was amenable to treatment in the juvenile system. R.R. at 66–75; 88–89.

On cross-examination, the Commonwealth asked Dr. Heilbrun if Appellant admitted that he committed the crimes. R.R. at 92. Dr. Heilbrun testified that during the examinations, Appellant stated that he was innocent. R.R. at 92. The Commonwealth then asked Dr. Heilbrun if Appellant's denial of guilt had any effect on his conclusion that Appellant was amenable to treatment. R.R. at 92–93. Dr. Heilbrun responded that it was "impossible at [the] pre-trial stage" to consider Appellant's assertion of innocence as indicating that Appellant could not be rehabilitated. R.R. at 93. Dr. Heilbrun, nonetheless, conceded in a hypothetical scenario that if a defendant were convicted of a crime, and still maintained his innocence, then there would be "a problem for treatment" and rehabilitation. R.R. at 93.

In response, the Commonwealth called Dr. John O'Brien to testify as an expert in the field of psychiatry. Dr. O'Brien conducted a psychiatric evaluation of Appellant, and noted that Appellant "was very avoidant" in talking about "the evidence that was presented at the preliminary hearing" and also "the factual allegations

---

* Retired Senior judge assigned to Superior Court.

of the offense." R.R. at 277–78. Dr. O'Brien testified that Appellant stated he did not commit the crime, and opined that Appellant could not be rehabilitated. R.R. at 277–78; 280–81. In particular, Dr. O'Brien concluded:

> ... [Appellant] tends to avoid or reacts by avoiding taking responsibility, which, in my opinion, complicates the process of rehabilitation, because ... in order to be rehabilitated as a result of a conviction for a serious crime, you have to take responsibility for your behavior ...
>
> And [Appellant cannot] make the first step [towards rehabilitation] if [he] ... doesn't take responsibility for [his] behavior ...

R.R. at 280–81. Dr. O'Brien further noted that in his experience, a great majority of the defendants that he encountered would not take responsibility for their criminal actions following their convictions. R.R. at 280–81.[1]

On March 29, 2010, the trial court denied Appellant's petition. The trial court, *inter alia,* concluded that Appellant was not amenable to treatment within the juvenile system and could not be rehabilitated by the age of 21. Trial Court Opinion (T.C.O.), 3/29/10, at 9. In making its determination, the trial court credited Dr. O'Brien's opinion that "the first step towards rehabilitation cannot be taken unless [Appellant] would come forward and take responsibility for his actions[.]" *Id.* at 14. The trial court found "persuasive reasoning from Dr. O'Brien" that Appellant would not take responsibility for his actions, and thus, "the prospects of rehabilitation within the juvenile court jurisdiction [was] likely to be unsuccessful." *Id.* at 15. For this reason, the trial court

found that Appellant failed to establish that he was amenable to treatment.

Appellant then filed an Application to Amend the March 29, 2010 Order to Include the Statement Specified in 42 Pa. C.S.A. § 702(b). Appellant contended that the trial court, by requiring him to admit guilt or accept responsibility to prove that he was amenable to treatment, violated his Fifth Amendment rights against self-incrimination.

By order dated May 12, 2010, the trial court granted Appellant's application. The trial court amended its March 29, 2009 order to include a statement that the order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the matter." R.R. at 20; *see* 42 Pa.C.S.A. § 702(b). In addition, the trial court found "that there exists no Pennsylvania appellate authority that has ever addressed a defendant's right against self-incrimination in the context of a proceeding to decertify a criminal case to juvenile court." R.R. at 20.

In its May 12, 2010 order, the trial court also elaborated on its reasoning for finding that Appellant was not amenable to treatment. The trial court stated that it "was not concluding as a matter of law [that] a child must confess in order to be decertified to juvenile court, and that any discussion by the court of the relationship between taking responsibility for the underlying offense and rehabilitation was solely in reference to addressing and evaluating the evidence on that issue[.]" R.R. at 20. Although the trial court accepted Dr. O'Brien's expert testimony, the trial court insisted that it did not find, as a

---

1. Dr. O'Brien's work has been almost exclusively with adult defendants. During his career, he has been involved in only 10 to 15 juvenile transfer petition hearings. R.R. at 259.

matter of law, "that [Appellant] must confess in order to be rehabilitated[.]" R.R. at 20.

On June 11, 2010, Appellant filed a Petition for Permission to Appeal from an Interlocutory Order in this Court. R.R. at 42–54. On July 27, 2010, this Court issued a *per curiam* order permitting an interlocutory appeal in this matter.[2]

On appeal, Appellant raises the following issues for review:

1. At the pre-adjudicative stage, is it an abuse of discretion for the Trial Court to base a decision under 42 Pa.C.S.A. § 6322 that a child is not amenable to treatment and therefore that the case should not be transferred to the juvenile system, on the fact that the child has not admitted to committing the offense prior to the decertification hearing?

2. At a pre-adjudicative stage, did the Trial Court's finding that a child's assertion of innocence demonstrated a lack of amenability to treatment constitute a misinterpretation of 42 Pa.C.S.A. § 6322 that violates Due Process and Fundamental Fairness as guaranteed by the United States and Pennsylvania Constitutions?

3. At a pre-adjudicative stage, did the Trial Court's finding that a child's assertion of innocence demonstrated a lack of amenability to treatment constitute a misinterpretation of 42 Pa.C.S.A. § 6322 that violates the presumption of innocence and right against self incrimination guaranteed by the United States and Pennsylvania Constitutions?

Brief for Appellant at 5.[3]

Here, the Commonwealth charged Appellant with homicide and homicide of an unborn child.

The Juvenile Act, 42 Pa.C.S.A. § 6301 *et seq.*, is designed to effectuate the protection of the public by providing children who commit "delinquent acts" with super-

**2.** We note that in *Commonwealth v. Johnson*, 542 Pa. 568, 669 A.2d 315, 322–323 (1995), our Supreme Court authorized the Commonwealth to appeal from an order granting transfer from the criminal division to the juvenile division. The Court concluded that from the prospective of the Commonwealth, an order granting transfer qualified as an interlocutory appeal as of right under Pa. R.A.P. 311(d) because double jeopardy attaches at the initiation of a juvenile adjudicatory hearing. *Id.* However, in the converse situation, where a juvenile seeks to appeal from an order denying transfer, the order is interlocutory and non-appealable, and the juvenile must resort to the process in 42 Pa. C.S.A. § 702(b) to obtain immediate appellate review. *Commonwealth v. McMurren*, 945 A.2d 194, 195 (Pa.Super.2008) ("Where a juvenile appeals the … denial of transfer from the criminal division, double jeopardy protections are not implicated. Such orders are … interlocutory, and are not appealable until judgment of sentence has been entered. The defendant's rights to contest the trial court's transfer decision are fully preserved … [and]

may be vindicated on appeal.") (citation omitted). Because Appellant has adhered to the dictates of 42 Pa.C.S.A. § 702(b), we have jurisdiction over the appeal pursuant to that statutory provision. *See id.* at 195–96.

**3.** In support of Appellant's position, an *amicus curiae* brief was filed on behalf of the Campaign for Youth Justice, the Defender Association of Philadelphia, the Pennsylvania Prison Society, Professor Jeffrey Shook, Professor Elizabeth Scott, Professor Barry C. Feld, the Center on Wrongful Conviction of Youth, and the Campaign for the Fair Sentencing of Youth. The brief is primarily devoted to discussing the neurological and psychological development of preadolescents and the juvenile justice system as a rehabilitative social institution.

Although informative and enlightening, the information contained in the *amicus* brief was not provided to the trial court for consideration. Therefore, the *amicus* brief was not relied upon by this Court in rending this opinion.

vision, rehabilitation, and care while promoting responsibility and the ability to become a productive member of the community. 42 Pa.C.S.A. § 6301(b)(2). The Juvenile Act defines a "child" as a person who is under eighteen years of age. 42 Pa.C.S.A. § 6302. Typically, most crimes involving juveniles are tried in the juvenile court of the Court of Common Pleas.

Our legislature, however, has deemed some crimes so heinous that they are excluded from the definition of "a delinquent act." Pursuant to 42 Pa.C.S.A. § 6322(a) and § 6355(e), when a juvenile is charged with a crime, including murder or any of the other offenses excluded from the definition of "delinquent act" in 42 Pa.C.S.A. § 6302, the criminal division of the Court of Common Pleas is vested with jurisdiction. *See* 42 Pa.C.S.A. § 6302 (stating that a "delinquent act" shall not include the crime of murder); *Commonwealth v. Ramos,* 920 A.2d 1253, 1258 (Pa.Super.2007).

When a case involving a juvenile goes directly to the criminal division, the juvenile can request treatment within the juvenile system through a transfer process called "decertification." *Commonwealth v. Sanders,* 814 A.2d 1248, 1250 (Pa.Super.2003). To obtain decertification, it is the juvenile's burden to prove, by a preponderance of the evidence, that transfer to the juvenile court system best serves the public interest. 42 Pa.C.S.A. § 6322(a); *Commonwealth v. Smith,* 950 A.2d 327, 328 (Pa.Super.2008).

Pursuant to § 6322(a), the decertification court shall consider the factors contained in § 6355(a)(4)(iii) in determining whether the child has established that the transfer will serve the public interest. These factors are as follows:

(A) the impact of the offense on the victim or victims;

(B) the impact of the offense on the community;

(C) the threat to the safety of the public or any individual posed by the child;

(D) the nature and circumstances of the offense allegedly committed by the child;

(E) the degree of the child's culpability;

(F) the adequacy and duration of dispositional alternatives available under this chapter and in the adult criminal justice system; and

**(G) whether the child is amenable to treatment, supervision or rehabilitation as a juvenile by considering the following factors:**

(I) age;

(II) mental capacity;

(III) maturity;

(IV) the degree of criminal sophistication exhibited by the child;

(V) previous records, if any;

(VI) the nature and extent of any prior delinquent history, including the success or failure of any previous attempts by the juvenile court to rehabilitate the child;

**(VII) whether the child can be rehabilitated prior to the expiration of the juvenile court jurisdiction;**

(VIII) probation or institutional reports, if any;

(IX) any other relevant factors;

42 Pa.C.S.A. § 6355(a)(4)(iii) (emphasis added).

■ While the Juvenile Act requires that a decertification court consider all of these factors, it is silent as to the weight assessed to each by the court. *Sanders,* 814 A.2d at 1251. However, "[w]hen a juvenile seeks to have his case transferred from the criminal division to the juvenile division, he must show that he is in need of and amenable to treatment, supervision or rehabilitation in the juvenile system." *Commonwealth v. Johnson,* 542 Pa. 568, 669 A.2d 315, 320–321 (1995). "If the evi-

dence presented fails to establish that the youth would benefit from the special features and programs of the juvenile system and there is no special reason for sparing the youth from adult prosecution, the petition must be denied and jurisdiction remains with the criminal division." *Id.*

The ultimate decision of whether to certify a minor to stand trial as an adult is within the sole discretion of a decertification court. *Sanders,* 814 A.2d at 1251. This Court will not overturn a decision to grant or deny decertification absent a gross abuse of discretion. *Id.* at 1250. An abuse of discretion is not merely an error of judgment but involves the misapplication or overriding of the law or the exercise of a manifestly unreasonable judgment based upon partiality, prejudice or ill will. *Commonwealth v. Pennington,* 751 A.2d 212, 218 (Pa.Super.2000).

The issue in this case involves the trial court's application of 42 Pa.C.S.A. § 6355(a)(4)(iii)(G) and (G)(VII), namely whether Appellant "was amenable to treatment" and whether Appellant "can be rehabilitated prior to the expiration of the juvenile court jurisdiction." [4]

In his brief, Appellant mounts an as-applied challenge to 42 Pa.C.S.A. § 6355(a)(4)(iii)(G) and (G)(vii). Initially, Appellant contends that as a matter of fundamental fairness, the Fifth Amendment rights against self-incrimination should apply to decertification hearings. From this premise, Appellant argues that the trial court applied 42 Pa.C.S.A. § 6355(a)(4)(iii)(G) and (G)(vii) to the facts of his case in a way that infringed upon his rights against self-incrimination. Specifi-

cally, Appellant asserts that the trial court violated his rights against self-incrimination because it effectively required him to admit guilt or accept responsibility to prove that he was amenable to treatment and capable of rehabilitation. We agree.

When an appellant challenges the constitutionality of a statute, he or she presents this Court with a pure question of law, for which our standard of review is *de novo* and our scope of review is plenary. *Commonwealth v. Omar,* 602 Pa. 595, 981 A.2d 179, 185 (2009). "As a threshold matter, a statute is presumed to be constitutional and will only be invalidated as unconstitutional if it clearly, palpably, and plainly violates constitutional rights." *Commonwealth v. Morgan,* 913 A.2d 906, 911 (Pa.Super.2006) (citation omitted). Further, a defendant may contest the constitutionality of a statute on its face or as-applied.

A facial attack tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case. An as-applied attack, in contrast, does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right. A criminal defendant may seek to vacate his conviction by demonstrating a law's facial or as-applied unconstitutionality.

*United States v. Marcavage,* 609 F.3d 264, 273 (3d Cir.2010) (citations omitted).

The Fifth Amendment, in relevant part, provides that no person "shall be compelled in any criminal case to be a

---

4. The Juvenile Court has jurisdiction of a delinquent child if the child is under twenty-one years and committed an act of delinquency prior to reaching the age of eighteen. *See* 42 Pa.C.S.A. §§ 6302 and 6303. When the juvenile has attained the age of twenty-one, the court shall enter an order terminating court supervision of the juvenile. Pa.R.J.C.P. 630. Accordingly, Appellant has the burden to prove that he is amenable to treatment before he reaches the age of 21.

witness against himself." U.S. Const. Amend. V.[5] "The Fifth Amendment not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley,* 414 U.S. 70, 77, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973). "[T]he availability of the [Fifth Amendment] privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites." *Estelle v. Smith,* 451 U.S. 454, 462, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (citation omitted). The Fifth Amendment privilege against self-incrimination can be asserted in any proceeding "in which the witness reasonably believes that the information sought, or discoverable as a result of his testimony, could be used in a subsequent state or federal criminal proceeding." *United States v. Balsys,* 524 U.S. 666, 672, 118 S.Ct. 2218, 141 L.Ed.2d 575 (1998).

■ It is well-settled that the Fifth Amendment is applicable to juvenile proceedings that decide the issue of guilt and whether to adjudicate a juvenile delinquent. *In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). Moreover, in *Kent v. United States,* 383 U.S. 541, 561–62, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), the United States Supreme Court concluded that, although not an adjudicatory proceeding, a hearing to determine whether to transfer a child from the juvenile court to the criminal court system was a "critically important" proceeding entitled to "the essentials of due process and fair treatment." Indeed, the consequences of a transfer hearing can be monumental. As the Supreme Court of California observed:

> The result of a [transfer] hearing is not a final adjudication of guilt; but the certification of a juvenile offender to an adult court has been accurately characterized as "the worst punishment the juvenile system is empowered to inflict." (Note, Separating the Criminal from the Delinquent: Due Process in Certification Procedure (1967) 40 So.Cal.L.Rev. 158, 162.) Here, because [the juvenile] was bound over to criminal court to face murder charges, she could face a penalty as severe as life imprisonment. (Pen. Code, §§ 190, 190.5.) Had she been found fit to be rehabilitated in the juvenile system, she normally could not have been confined to the Youth Authority beyond her 25th birthday.

*Ramona R. v. Superior Court,* 37 Cal.3d 802, 810–11, 210 Cal.Rptr. 204, 693 P.2d 789 (1985).[6]

Following the collective spirit of *In re Gault, Kent,* and *Estelle,* a majority of state court jurisdictions have held that the Fifth Amendment applies to juvenile transfer hearings, and that a juvenile cannot be compelled to incriminate him/herself as part of those proceedings. *See, e.g., William M. v. State,* 124 Nev. 95, 196 P.3d 456 (2008); *State v. Davis,* 268 Kan. 661, 998 P.2d 1127 (2000); *Commonwealth v. Wayne W.,* 414 Mass. 218, 606 N.E.2d 1323

5. Similarly, the Pennsylvania Constitution provides that a person "cannot be compelled to give evidence against himself." Pa. Const. Art. I, § 9.

6. Under California law (as well as a number of other states), the child accused of committing a crime is charged as a juvenile and the state may seek to have the child transferred to adult criminal court for trial. However, as previously discussed, the reverse occurred in this case—Appellant was charged as an adult in criminal court and sought transfer to juvenile court.

(1993); *Christopher P. v. State*, 112 N.M. 416, 816 P.2d 485 (1991); *Ramona R.*, 210 Cal.Rptr. 204, 693 P.2d at 794–95; *In re Welfare of S.J.T.*, 736 N.W.2d 341 (Minn. Ct.App.2007); *People ex rel. A.D.G.*, 895 P.2d 1067 (Colo.App.1994); *R.H. v. State*, 777 P.2d 204 (Alaska App.1989); *In re Appeal in Pima County, Juvenile Action*, 139 Ariz. 446, 679 P.2d 92 (App.1984); *J.T.P. v. State*, 544 P.2d 1270 (Okla.Crim. App.1975).

There is, however, a notable amount of authority to the contrary. *See Otis v. State*, 355 Ark. 590, 142 S.W.3d 615 (2004); *People v. Hana*, 443 Mich. 202, 504 N.W.2d 166 (1993); *K.W.M. v. State*, 598 S.W.2d 660 (Tex.Civ.App.1980), *but see Simpson v. State*, 181 S.W.3d 743 (Tex.Ct.App. 12th Dist.2005); *In re Pers. Restraint of Hegney*, 138 Wash.App. 511, 158 P.3d 1193 (2007); *State ex rel. A.B.*, 936 P.2d 1091 (Utah Ct.App.1997).

In general, the majority view concludes that the Fifth Amendment applies to a juvenile transfer hearing because a transfer hearing is "comparable in seriousness to criminal prosecution." *Davis*, 998 P.2d at 1136. The majority view finds that transfer hearings are not "neutral proceedings;" rather, they are "fully adversary proceedings in which the burden of establishing a child's probable [ ]amenability to treatment is formally allocated [to a party]." *Id.* (quoting *R.H.*, 777 P.2d at 210). Additionally, the majority view stresses that the government's role in the transfer hearings "is not [one] acting solely in the interest of the child." *Id.*

The minority view, in contrast, finds that a juvenile is merely presented "with hard choices" and can choose not to incriminate himself at a transfer hearing. *State ex rel. A.B.*, 936 P.2d at 1100. The minority view also emphasizes that a transfer hearing determines the venue of the proceedings and "is not an adjudication of the child's guilt or innocence." *K.W.M.*, 598 S.W.2d at 662; *accord Hana*, 504 N.W.2d at 174–75. According to the minority view, a transfer hearing is a "comparatively informal proceeding," and "the procedure itself cannot lead to a juvenile's loss of liberty." *In re Hegney*, 158 P.3d at 1203. For these reasons, the minority view concludes that the Fifth Amendment is inapplicable to juvenile transfer hearings.

Although most of the above cases addressed the Fifth Amendment in the situation where the state sought transfer from juvenile to criminal court, their reasoning is equally applicable to where, as here, the juvenile seeks transfer from criminal to juvenile court, *i.e.*, decertification. Aside from the fact that the burden of proof lies with the state in transfer hearings, while the burden of proof lies with the juvenile in decertification hearings, there are no major procedural or substantive differences between transfer and decertification proceedings, as the ultimate purpose and outcome remains the same. This Court, accordingly, applies the reasoning of the above case law to determine whether the Fifth Amendment is applicable to decertification hearings.

■ Given the adversary nature and the severe, potential consequences of a juvenile decertification hearing—life in prison without parole—this Court follows the majority view and concludes that the Fifth Amendment is applicable to decertification hearings. For the reasons that follow, this Court disagrees with the minority view.

First, the minority view disregards the practical results of a juvenile transfer hearing, which has been described by one commentator as "a sentencing decision that represents a choice between the punitive disposition of adult criminal court and the 'rehabilitative' disposition of the juve-

nile court."[7] In *Commonwealth v. Ghee*, 889 A.2d 1275, 1279 (Pa.Super.2005), a panel of this Court acknowledged the significance of transfer or decertification and commented:

> The juvenile system inherently confers substantial benefits. For instance, the juvenile system's goal is to rehabilitate the juvenile on an individual basis without marking him or her as a criminal, rather than to penalize the juvenile. The juvenile is also shielded from publicity. He or she may be confined, but with rare exceptions, may not be jailed along with adults. He or she may be detained, but only until attaining the age of twenty-one (21) years. The child is also protected against consequences of adult conviction such as the loss of civil rights, the use of adjudication against him or her in subsequent proceedings, and disqualification for public employment.

*Id.* The majority view therefore conforms with our observation in *Ghee.*

Second, the minority view mischaracterizes transfer or decertification proceedings as an informal event that simply determines the venue of the case. We agree with the court in *R.H.* that juvenile transfer proceedings "[cannot] realistically be said to affect only the forum where the issue of guilt will be adjudicated. A juvenile [transfer/decertification] proceeding is the only available avenue by which the state may seek to prosecute a child as an adult." 777 P.2d at 210. Although jurisdiction in Appellant's case was originally vested in criminal court, the juvenile court is vested with concurrent jurisdiction. Appellant has a statutory right to seek transfer to the juvenile division, and the Commonwealth, as adversary, must contest the

petition to keep jurisdiction in the criminal division—for this is the "only available avenue" by which the Commonwealth could try Appellant as an adult. Moreover, the Fifth Amendment privilege focuses not on the "type of proceeding," but rather, "upon the nature of the statement or admission and the exposure which it invites." *Estelle*, 451 U.S. at 462, 101 S.Ct. 1866 (citation omitted).

Third, and most importantly, the minority view undermines the underlying intent and the broad scope of the Fifth Amendment privilege. The United States Supreme Court has held that the privilege applies to "formal or informal" proceedings, *id.,* and protects testimony if it provides "a link in the chain of evidence needed to prosecute the claimant for a [ ] crime." *Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118 (1951). If a juvenile is compelled (or provided with an incentive) to incriminate himself at a transfer or decertification hearing, the incriminating evidence could possibly be used against him/her in the subsequent criminal or juvenile court proceeding. While a minor does not have a constitutional right to be retained in the juvenile system, *Hana*, 504 N.W.2d at 175, a state cannot devise a procedural mechanism in which to coerce a minor to volunteer incriminating evidence that could serve as a basis for criminal sanctions. We conclude, accordingly, that the essentials of due process mandate that the Fifth Amendment applies to decertification hearings.

Having concluded that the Fifth Amendment rights against self-incrimination are applicable in decertification hearings, we

---

7. Barry C. Feld, *Criminalizing Juvenile Justice: Rules of Procedure for the Juvenile Court,* 69 MINN. L. REV 141, 269 (1984).

now address the issue of whether Appellant's rights where violated in this case.

 "The privilege against self-incrimination generally protects an individual from being compelled to incriminate himself in any manner." *Commonwealth v. Long*, 831 A.2d 737, 743 (Pa.Super.2003). "In addition to guaranteeing the right to remain silent unless immunity is granted, the Fifth Amendment proscribes only self-incrimination obtained by a genuine compulsion of testimony." *Commonwealth v. Padillas*, 997 A.2d 356, 362 (Pa.Super.2010) (citation omitted). For Fifth Amendment purposes, compulsion exists when some factor denies the individual the "free choice to admit, to deny, or to refuse to answer." *Lisenba v. California*, 314 U.S. 219, 241, 62 S.Ct. 280, 86 L.Ed. 166 (1941). When the assertion of the Fifth Amendment privilege is subject to a "penalty," it forecloses "a free choice to remain silent" and therefore "compels" the incriminating testimony. *Garner v. United States*, 424 U.S. 648, 661, 96 S.Ct. 1178, 47 L.Ed.2d 370 (1976). Further, a "penalty is not restricted to fine or imprisonment," but instead, encompasses "the imposition of any sanction which makes assertion of the Fifth Amendment privilege costly." *Spevack v. Klein*, 385 U.S. 511, 514, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967) (citation and internal quotation marks omitted); *see McKune v. Lile*, 536 U.S. 24, 35, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002) (plurality).

 Generally, to avoid violating a defendant's Fifth Amendment rights, a statute cannot require a defendant to incriminate himself. *See Marchetti v. United States*, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968).

In *William M.*, the Supreme Court of Nevada considered a facial challenge to Nevada's juvenile transfer statute and concluded that it infringed upon a juvenile's rights against self-incrimination. The State of Nevada enacted a presumptive transfer statute which permitted the government to try juvenile offenders in criminal court. In particular, the statute mandated that juveniles 14 years of age or older who had been charged with certain offenses were to be presumptively certified as adults and tried in criminal court. Under the statute, the juveniles could rebut the presumption by proving that when they committed the crime it was the result of substance abuse or emotional or behavioral problems. In order to rebut the presumption, however, the juveniles had to admit that they had committed the crime with which they were charged. Additionally, the juveniles' admissions of the criminal conduct could be used against them in a subsequent proceeding because the statute did not immunize the juveniles' statements. In these circumstances, the Supreme Court of Nevada, *sub silentio*, found that the prospects of trial in the criminal court, as opposed to juvenile court, operated as a penalty that sufficiently compelled juveniles to incriminate themselves.

Ultimately, the court in *William M.* concluded that the presumptive transfer statute was unconstitutional under the Fifth Amendment because the statute required the juveniles to incriminate themselves in order to rebut the presumption and obtain transfer to juvenile court. 196 P.3d at 464 (concluding that the statute's "requirement that a juvenile admit the charged criminal conduct, and thereby incriminate himself, in order to overcome the presumption of adult certification is unconstitutional.").

Although *William M.* is not binding on this Court, we find it to be persuasive. First, the statute at issue in *William M.* is remarkably similar in purpose and effect to Pennsylvania's decertification statute. Both statutes provide juveniles with an opportunity to seek transfer from criminal

court to juvenile court, and place the burden of proof on the juvenile to demonstrate that he/she has met the criteria necessary to obtain transfer. Second, we find that the decision in *William M.* is well-reasoned and evidences a straightforward application of Fifth Amendment principles. As such, this Court applies the reasoning and holding of *William M.* to the facts of this case.

Here, Appellant was certified in criminal court and charged with two counts of homicide. Appellant sought decertification and transfer to the juvenile system, and it was his burden to prove, by a preponderance of the evidence, that transfer to the juvenile court system best served the public interest.

As part of his burden of proof, Appellant had to establish that he was amenable to treatment, which included an inquiry as to whether Appellant "[could] be rehabilitated prior to the expiration of the juvenile court jurisdiction." 42 Pa.C.S.A. § 6355(a)(4)(iii)(G) and (G)(VII). Despite the trial court's assertions to the contrary, the trial court applied 42 Pa.C.S.A. § 6355(a)(4)(iii)(G) in a manner that required Appellant to admit his guilt or accept responsibility to demonstrate that he was amenable to treatment and capable of rehabilitation. Although the trial court claimed that it did not conclude that Appellant "must confess in order to be rehabilitated," but instead, was simply "evaluating the evidence" before it, R.R. at 20,

the trial court's application of the law to the facts of this case prove otherwise.

■ During the psychological evaluations, Appellant asserted his innocence and refused to discuss the details of the crimes he allegedly committed. The trial court accepted the testimony of the Commonwealth's expert, Dr. O'Brien, that Appellant was not amenable to treatment and could not be rehabilitated unless he took responsibility for his actions. Relying on Dr. O'Brien's testimony, the trial court concluded that Appellant failed to establish that he was amenable to treatment because Appellant would not "come forward and take responsibility for his actions[.]" T.C.O., 3/29/10, at 14. However, in order to accept responsibility for his actions, Appellant would necessarily have to admit guilt and incriminate himself. In essence, because Appellant did not concede guilt as a matter of fact, the trial court concluded that Appellant failed to establish that he was amenable to treatment as a matter of law. The trial court, therefore, interpreted and applied 42 Pa.C.S.A. § 6355(a)(4)(iii)(G) to effectively require Appellant to admit and discuss his involvement in the actions constituting the criminal offenses. Under *William M.*, the trial court's application of 42 Pa.C.S.A. § 6355(a)(4)(iii)(G) violated Appellant's rights against self-incrimination by, in essence, concluding that Appellant had to admit guilt to prove amenability to treatment and obtain transfer to juvenile court.[8]

---

8. The trial court attempted to support its requirement that Appellant admit guilt to prove amenability to treatment on the ground that the requirement "[was] not a statement of law but [was] a matter of evidence that was put forth by [Appellant] himself through his own expert witness." R.R. at 36. This assertion is not supported by the record. Although Dr. Heilbrun testified on cross-examination that a defendant who denies guilt *after* being convicted by a jury may have problems for rehabilitation purposes, Dr. Heilbrun was clear that it was impossible to calculate the effect of such denial during the *pre-trial* stage. R.R. at 93. As a result, the trial court applied the law of 42 Pa.C.S.A. § 6355(a)(4)(iii)(G) solely to Dr. O'Brien's testimony that Appellant was not amenable to treatment because he did not admit guilt or accept responsibility for his actions.

Our conclusion is not altered by the fact that a statutory provision, 42 Pa.C.S.A. § 6338(c)(1), could arguably render any statements that Appellant made to Dr. O'Brien inadmissible in a subsequent juvenile or criminal proceeding. 42 Pa.C.S.A. § 6338(c)(1) does not grant Appellant use/derivative use immunity for the statements he made in connection with the psychiatric interviews. Rather, it provides Appellant with basic or pure use immunity. As such, this statutory provision, assuming that it is applicable to decertification hearings, is insufficient to overcome Appellant's Fifth Amendment rights and compel Appellant to incriminate himself.

In 2008, 42 Pa.C.S.A. § 6338 was amended to include subsection (c)(1). This subsection provides:

§ 6338. **Other basic rights**

\* \* \*

(c) STATEMENTS AND INFORMATION OBTAINED DURING SCREENING OR ASSESSMENT.—

(1) No statements, admissions or confessions made by or incriminating information obtained from a child in the course of a screening or assessment that is undertaken in conjunction with any proceedings under this chapter, including, but not limited to, that which is court ordered, shall be admitted into evidence against the child on the issue of whether the child committed a delinquent act

9. By its very language, 42 Pa.C.S.A. § 6338(c)(1) applies without limitation to "any proceedings under this chapter," specifically Chapter 63, Juvenile Matters, and this broad language could arguably include transfer proceedings under 42 Pa.C.S.A. § 6322. On the other hand, this Court has held that the scope of the Juvenile Act is limited to matters within the Juvenile Court jurisdiction, and thus, a proceeding to transfer from the criminal to the juvenile court does not invoke the Juvenile Act (or any of its provisions) until

under this chapter or on the issue of guilt in any criminal proceeding.

42 Pa.C.S.A. § 6338(c)(1).

For purposes of this appeal, we assume, without expressly deciding, that 42 Pa. C.S.A. § 6338(c)(1) would shield any "statements, admissions or confessions" that Appellant would have made to Dr. O'Brien in connection with the psychiatric evaluation. *See* 42 Pa.C.S.A. § 6302 (Definitions) (defining an "assessment" to include "psychological and psychiatric evaluation").[9]

■ With a proper grant of immunity, a witness/defendant's Fifth Amendment privilege against self-incrimination is displaced, and the witness/defendant can be compelled to testify. *See Bill Heard Leasing, Inc. v. Fineberg*, 265 Pa.Super. 129, 401 A.2d 834, 836 (1979). In general, there are three types of immunity. *Commonwealth v. Swinehart*, 541 Pa. 500, 664 A.2d 957, 960 n. 5 (1995).

"Use" immunity provides immunity only for the testimony actually given pursuant to the order compelling said testimony. "Use and derivative use" immunity enlarges the scope of the grant to cover any information or leads that were derived from the actual testimony given under compulsion.... "Transactional" immunity is the most expansive, as it in essence provides complete amnesty to the witness for any transactions which

*after* a case has been transferred to the juvenile court. *Commonwealth v. Davis*, 330 Pa.Super. 551, 479 A.2d 1041 (1984), *aff'd* 510 Pa. 536, 510 A.2d 722 (1986). Therefore, given the reasoning of *Davis*, 42 Pa.C.S.A. § 6338(c)(1) could be inapplicable to decertification hearings. In any event, this Court need not resolve this issue; for purposes of this appeal, we will assume that 42 Pa.C.S.A. § 6338(c)(1) would immunize Appellant's statements to Dr. O'Brien.

are revealed in the course of the compelled testimony.

*Id.*

■■■■■ "While a grant of immunity must afford protection commensurate with that afforded by the [Fifth Amendment] privilege, it need not be broader." *Commonwealth v. Webster*, 323 Pa.Super. 164, 470 A.2d 532, 535 (1983) (quoting *Kastigar v. United States*, 406 U.S. 441, 453, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972)). Transactional immunity is sufficient to compel testimony over a Fifth Amendment claim of privilege because it transcends the protection afforded by the privilege. *Commonwealth v. Webster*, 323 Pa.Super. 164, 470 A.2d 532, 535 (1983). "[I]mmunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination, and therefore is [also] sufficient to compel testimony over a claim of the privilege." *Id.* (quoting *Kastigar*, 406 U.S. at 453, 92 S.Ct. 1653). Pure or basic use immunity, however, is insufficient to overbear the Fifth Amendment privilege because it is not commensurate with the privilege. *United States v. Goodwin*, 470 F.2d 893, 904 (5th Cir.1972).

■■■■ Pure or basic use immunity "protects the witness only from the use of the specific testimony compelled from him under the grant of immunity, but not from evidence obtained as a result of such testimony." *Gosling v. Commonwealth*, 14 Va. App. 158, 415 S.E.2d 870, 873 (1992) (quoting *Kastigar*, 406 U.S. at 449–50, 92 S.Ct. 1653). The courts have acknowledged "that witnesses protected only by use immunity may be pursued by prosecutors with evidence [ ] derived from compelled testimony and, consequently, have found it inadequate to overcome an assertion of the [Fifth Amendment] privilege." *Id.* (citations omitted).

Here, 42 Pa.C.S.A. § 6338(c)(1) grants Appellant with basic or pure use immunity, providing Appellant with immunity solely for his statements, admissions, confessions and incriminating information. Unlike the protections afforded by use/derivative use immunity, 42 Pa.C.S.A. § 6338(c)(1) does not shield Appellant from the introduction of evidence that is directly and indirectly derived from his statements and admissions. Consequently, 42 Pa.C.S.A. § 6338(c)(1) is not co-extensive with the scope of the Fifth Amendment privilege, and it is insufficient to override Appellant's Fifth Amendment rights and compel Appellant to testify against himself. *See In re Mark A.*, 156 Cal.App.4th 1124, 1134–35, 68 Cal.Rptr.3d 106 (Cal.Ct.App. 4th Dist. 2007) (concluding that statute that provides the "[t]estimony of a parent . . . shall not be admissible as evidence in any other action or proceeding" was not co-extensive with the Fifth Amendment because it granted only pure use immunity and not use/derivative use immunity); *In re Dependency of J.R.U.-S.*, 126 Wash.App. 786, 110 P.3d 773, 779 (2005) ("[The statute] speaks only of 'use' immunity. It does not purport to provide immunity for evidence derived from immunized statements. The statute thus provides less comprehensive immunity than the Fifth Amendment."); *Gosling*, 415 S.E.2d at 873. Therefore, we conclude that the grant of use immunity in 42 Pa.C.S.A. § 6338(c)(1) cannot compel Appellant to incriminate himself at a decertification hearing, because the statutory provision does not immunize evidence that is directly and indirectly obtained from Appellant's statements and admissions.

In reaching our decision, we recognize that courts have upheld the Federal and New Jersey transfer statutes against Fifth Amendment challenges due, in large part, to the fact that the statutes provided pure use immunity to juveniles for self-incriminating statements they made during the transfer proceedings. *See United States*

*v. Mitchell H.*, 182 F.3d 1034, 1035–36 (9th Cir.1999); *United States v. A.R.*, 38 F.3d 699, 703 and n. 5 (3d Cir.1994); *State in Interest of A.L.*, 271 N.J.Super. 192, 638 A.2d 814 (1994).

In *Mitchell H.*, the Court of Appeals for the Ninth Circuit followed the Third Circuit's decision in *A.R.* and concluded that a juvenile's statements to a psychiatrist were not protected by the Fifth Amendment. The *Mitchell H.* court found that in the context of a transfer proceeding, a juvenile's statements at a psychiatric evaluation "served a limited, neutral purpose"—*i.e.*, to determine where the case should be tried—since a provision in the transfer statute, 18 U.S.C.A. § 5032, rendered the juvenile's statements inadmissible in a subsequent proceeding. 182 F.3d at 1035–36. According to the *Mitchell H.* court, "[b]y so limiting the use of statements made during a pre-hearing psychiatric evaluation, [18 U.S.C.A. § 5032] ensures that a juvenile does not unwittingly incriminate himself." *Id.* at 1036.

Likewise, in *State in Interest of A.L.*, the New Jersey Court of Appeals concluded that a statutory grant of pure use immunity was sufficient to remove any Fifth Amendment concerns. As stated by the court: "Even assuming that an admission of guilt is implicitly required in order for the juvenile to have a chance to remain in family court, this admission has no adverse legal consequences. The juvenile's testimony is fully immunized by N.J.S.A. 2A:4A–29. It is inadmissible 'for any purpose in any hearing to determine delinquency or guilt.' [The juvenile] is not penalized in any sense by choosing to admit guilt at a waiver hearing." 638 A.2d at 822 (quoting N.J.S.A. 2A:4A–29).

In both *Mitchell H.* and *State in Interest of A.L.*, the immunizing statutes only provided the juvenile defendant with pure use immunity, as opposed to use/derivative use immunity. The courts in *Mitchell H.* and *State in Interest of A.L.* failed to recognize the critical distinction between use and derivative/use immunity, and thus, we find these decisions to be unpersuasive. As explained above, pure use immunity cannot abridge a juvenile's Fifth Amendment rights against self-incrimination. With a grant of use immunity, evidence directly and indirectly obtained from the juvenile's statements would be admissible against the juvenile in a later proceeding. Consequently, we cannot agree that 42 Pa.C.S.A. § 6338(c)(1)'s grant of use immunity "ensures that a juvenile does not unwittingly incriminate himself," *Mitchell H.*, 182 F.3d at 1036, or that a juvenile's statements do not have any "adverse legal consequences," *State in Interest of A.L.*, 638 A.2d at 822–23. By discussing the details of the alleged crime with a psychologist/psychiatrist, a juvenile may disclose facts that were not discovered by the Commonwealth, which, in turn, could lead the Commonwealth to new sources of inculpatory evidence and also the filing of new, additional charges. "The essence of [the Fifth Amendment] is the requirement that the State which proposes to convict and punish an individual produce the evidence against him by the independent labor of its officers, not by the simple, cruel expedient of forcing it from his own lips." *Estelle*, 451 U.S. at 462, 101 S.Ct. 1866 (citation and internal quotation marks omitted).

In the absence of the requisite grant of at least use/derivative use immunity, the trial court in this case required Appellant to admit guilt or accept responsibility for his actions in violation of Appellant's Fifth Amendment rights against self-incrimination. If Appellant remains in criminal court, he faces a potential sentence of life imprisonment without the opportunity for parole. On the other hand, if Appellant can prove that transfer to the juvenile

court is in the public interest, he would receive treatment in the juvenile system until the age of 21. Obviously, Appellant has a strong incentive to invoke his statutory rights and seek decertification and transfer to juvenile court. Given these circumstances, we conclude that Appellant was subject to a "penalty" sufficient to compel or coerce his testimony for purposes of the Fifth Amendment.

The "[Fifth] Amendment speaks of compulsion," *United States v. Monia*, 317 U.S. 424, 427, 63 S.Ct. 409, 87 L.Ed. 376 (1943), and the United States Supreme Court has declared that the "constitutional guarantee is only that the witness not be *compelled* to give self-incriminating testimony." *McKune*, 536 U.S. at 36, 122 S.Ct. 2017 (emphasis in original) (citing *United States v. Washington*, 431 U.S. 181, 188, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977)). The issue is whether the statute's objectives, and the consequences of a defendant's failure to provide self-incriminating statements, "create a compulsion that encumbers the constitutional right." *McKune*, 536 U.S. at 35, 122 S.Ct. 2017.

In a string of "guilty plea" cases, the United States Supreme Court has held that the government may offer substantial benefits to a defendant in return for a guilty plea without violating the Fifth Amendment. *See, e.g., Corbitt v. New Jersey*, 439 U.S. 212, 99 S.Ct. 492, 58 L.Ed.2d 466 (1978); *Bordenkircher v. Hayes*, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978); *Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). In *Corbitt*, the United States Supreme Court stated: "[N]ot every burden on the exercise of a constitutional right, and not

every pressure or encouragement to waive such a right, is invalid. Specifically, there is no per se rule against encouraging guilty pleas. We have squarely held that a State may encourage a guilty plea by offering substantial benefits in return for the plea." 439 U.S. at 218–19, 99 S.Ct. 492. In short, the United States Supreme Court has taken the view that the benefits associated with a guilty plea or plea bargain do not "compel" a defendant to incriminate himself because the defendant has the free choice to decide whether to accept and enter a plea.

In another line of cases, however, the United States Supreme Court has also held that the government may not impose a "penalty" on a person asserting his Fifth Amendment privilege. *See, e.g., Minnesota v. Murphy*, 465 U.S. 420, 434, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984); *Lefkowitz v. Cunningham*, 431 U.S. 801, 804–08, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977); *Turley*, 414 U.S. at 77–78, 94 S.Ct. 316; *Gardner v. Broderick*, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (U.S.1968). These cases collectively conclude that sanctions such as loss of job, state contracts, future contracting privileges with the state, political office, the right to run for office and revocation of probation, constitute an impermissible "penalty" on the exercise of the privilege against self-incrimination. The threat of the penalty, in turn, was enough of a force so as to compel the defendant to testify against himself.[10]

Relying on the "guilty plea" cases, some courts have found in the sentencing context that a defendant's refusal to provide incriminating information to obtain a statu-

---

**10.** Although the Supreme Court has consistently held that the potential loss of livelihood does rise to the level of compulsion, the Court has not clearly defined other classes of consequences that constitute compulsion. Rather, the Court has traditionally engaged in a case-

by-case analysis to determine whether the pressure imposed rises to a level where it is likely to compel a person to be a witness against himself. *See McKune*, 536 U.S. at 49, 122 S.Ct. 2017 (O'Connor, J., concurring).

tory sentence reduction is more akin to a "denied benefit" than to a "penalty." On this reasoning, some courts have concluded that the Fifth Amendment is not implicated in the sentencing phase where the defendant must incriminate himself in order to receive the sentence reduction.

For example, in *United States v. Cruz,* 156 F.3d 366, 374 (2d Cir.1998), the Court upheld a sentencing provision that relieved a defendant from application of a mandatory minimum if the defendant truthfully provided the government with all evidence and information concerning the offense(s) for which he was convicted. The court held that "the choice confronting the defendant gives rise to no more compulsion than that present in a typical plea bargain. . . . [T]his choice, unlike the choice in the penalty cases, is [not] likely to exert such pressure upon an individual as to disable him from making a free and rational choice." *Id.; see United States v. Washman,* 128 F.3d 1305, 1307 (9th Cir. 1997); *United States v. Arrington,* 73 F.3d 144, 149 (7th Cir.1996).

Here, the trial court's requirement that Appellant admit guilt or accept responsibility for his actions is not analogous to the guilty plea and sentencing situations where a defendant relinquishes Fifth Amendment rights in exchange for the prospect of a more lenient sentence. Unlike the so-called "guilty plea" cases and their progeny, Appellant's admissions would be made solely to seek transfer to juvenile court—a pre-adjudicatory phase of the proceedings. Appellant's incriminating statements would not be volunteered in pursuit of sentencing leniency following a guilty plea or a sentencing "reward" following a conviction. Moreover, in contravention of Appellant's Fifth Amendment rights, the Commonwealth could later use evidence derived from Appellant's pre-trial admissions and statements in a trial involving the same criminal conduct regardless of whether Appellant was decertified. Conversely, in the guilty plea cases, a defendant admits guilt as part of a final adjudication, and the government (barring exceptional circumstances) is precluded from further prosecution under the terms of the plea agreement or the Double Jeopardy clause. *See generally United States v. Olmeda,* 461 F.3d 271 (2d Cir. 2006); *United States v. Johnson,* 169 F.3d 1092 (8th Cir.1999); *United States v. Baggett,* 901 F.2d 1546 (11th Cir.1990).

Because the trial court in this case required incriminating statements from Appellant prior to trial in a proceeding that does not act as a final adjudication of guilt, and Appellant was not sufficiently immunized from such statements, we conclude that the guilty plea cases are procedurally inapposite. The trial court's requirement that Appellant concede guilt or accept responsibility for his actions to receive transfer to the juvenile system cannot be perceived as simply denying Appellant a statutory benefit or reward—at least not when Appellant has yet to be convicted of any offense related to his alleged criminal conduct and remains subject to prosecution for incriminating statements. If Appellant admitted guilt on the factual allegations and discussed the details of the alleged crime(s), Appellant could not only advance the case against him for the crimes in which he was charged and not convicted, but also, could subject himself to criminal liability for crimes with which he was not charged. This exposure to broad criminal culpability, alone, distinguishes this case from those like *Cruz* that have applied the reasoning of the guilty plea cases to the sentencing stage for crimes and their related conduct after the defendant was already convicted.

The trial court's condition, therefore, coercively sought to grant Appellant the pos-

sibility of juvenile transfer in return for Appellant's incriminating statements. As part of the exchange, the Commonwealth could strengthen its case against Appellant, while Appellant would not be guaranteed transfer to the juvenile system. Given the facts of this case, the profound benefits of juvenile transfer are reasonably sufficient to compel Appellant to waive his Fifth Amendment rights and testify against himself. That is, the gross disparity between the potential sentence in the criminal and juvenile divisions operate to exert such pressure on Appellant to "foreclose a free choice to remain silent[ ] and therefore . . . compel the incriminating testimony." *Garner*, 424 U.S. at 661, 96 S.Ct. 1178; *cf. Robtoy v. Kincheloe*, 871 F.2d 1478, 1481 (1989) (stating that "the difference between life sentences with and without possibility of parole" is a "significant disparity," and that a person is "substantially benefited" when his sentence is changed from life without possibility of parole to life with possibility of parole).

■ In light of these circumstances, the trial court could not require Appellant to admit guilt or accept responsibility for crimes to which he was not convicted (or conceded in a guilty plea) under the guise and "penalty" of a profoundly increased sentence in the criminal division. *Cf. United States v. Oliveras*, 905 F.2d 623, 626 (2d Cir.1990) (interpreting a sentencing provision that provided for a reduction in sentence) ("So long as the defendant's statements are not immunized against use in subsequent criminal prosecutions, the effect of requiring a defendant to accept responsibility for crimes other than those to which he pled guilty or of which he has been found guilty is to penalize him for refusing to incriminate himself. This runs afoul of the fifth amendment."), *statute modified to conform to holding as stated in United States v. Austin*, 17 F.3d 27 (2d Cir.1994); *United States v. Piper*, 918 F.2d 839, 840 (9th Cir.1990) (same); *United States v. Perez–Franco*, 873 F.2d 455, 459 (1st Cir.1989) (same); *Bertrand v. United States*, 467 F.2d 901, 902 (5th Cir.1972) (ordering resentencing due to the trial judge's questioning of the defendant because "the effect of the trial judge's questioning was to impose an unconstitutional condition on the petitioner's Fifth Amendment rights: he could go into the details of the other offense [to which he did not plead guilty] . . . or he could exercise his right to be silent and receive a long sentence."); *but see United States v. Corbin*, 998 F.2d 1377, 1388 (7th Cir.1993) (collecting sentencing cases that hold to the contrary).[11] Therefore, we conclude that Appellant was "compelled" to incriminate himself as that term exists in the text of

11. The Federal Circuit Court of Appeals are split over the issue of whether a sentencing provision, which on its face permits a sentence reduction if a defendant admits criminal conduct beyond the particular offense(s) to which he has pled guilty, violates or burdens the Fifth Amendment rights against self-incrimination. *Corbin*, 998 F.2d at 1388–90. To date, the United States Supreme Court has not addressed this specific issue. *See Mitchell v. United States*, 526 U.S. 314, 330, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999).

As explained above, because juvenile transfer proceedings are pre-adjudicatory and not akin· to the guilty plea cases or sentencing proceedings, we find the principle of law espoused in *Oliveras* and its companions to be much more persuasive and analogous than the cases cited in *Corbin*. Moreover, in the guilty plea progeny cases, the minor sentencing reductions that the defendant would have received if he incriminated himself pale in comparison to the choice posed to Appellant: incriminate himself and possibly receive juvenile treatment until the age of 21, or not incriminate himself and face a potential life sentence without the opportunity for parole in criminal court. As such, the legal precept of *Oliveras* and its companions are more persuasive on this basis as well.

the Fifth Amendment.[12]

In this case, the trial court in essence compelled Appellant to waive his Fifth Amendment rights, ensuring that in no set of circumstances could Appellant be tried in the juvenile system if he invoked those rights. The trial court's interpretation of 42 Pa.C.S.A. § 6355(a)(4)(iii)(G) encourages a juvenile to tender an admission of guilt, but, significantly, the Commonwealth can use evidence derived from the juvenile's admissions and statements to secure a subsequent criminal conviction or an adjudication of delinquency. In this vein, the trial court's application of 42 Pa.C.S.A. § 6355(a)(4)(iii)(G) also had the impermissible effect of "chilling" the exercise of Appellant's Fifth Amendment rights.

 "[A] [statutory] procedure which offers an individual a reward for

waiving a fundamental constitutional right, or imposes a harsher penalty for asserting it, may not be sustained." *Hynes v. Tomei*, 92 N.Y.2d 613, 684 N.Y.S.2d 177, 706 N.E.2d 1201, 1204 (1998) (citation omitted); *see Bordenkircher v. Hayes*, 434 U.S. 357, 363, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978). In determining whether a statute chills the exercise of a constitutional right so as to render it unconstitutional, "[t]he question is not whether the chilling effect is 'incidental' rather than intentional; the question is whether th[e] effect is unnecessary and therefore excessive." *United States v. Jackson*, 390 U.S. 570, 582, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968).[13] A court must "balance the need for the challenged statute against its chilling effect on the exercise of a party's constitutional rights." *Winston v. New York*, 759 F.2d 242, 245 (2d Cir.1985).

---

**12.** Besides the holdings in *Oliveras* and its followers, we find further analogous support for our conclusion in the case law from other jurisdictions that have addressed the penalty concept in different factual patterns. Generally, these cases hold that a defendant may not be required to incriminate himself in order to receive the benefit of a right secured by law. *See State v. Brown*, 286 Kan. 170, 182 P.3d 1205 (2008) (concluding that state agency could not require a defendant to make incriminating statements to re-obtain custody of his abused child who had been committed to state control; the defendant had a liberty interest in his child, and the penalty of non-reunification was capable of coercing incriminating testimony); *Pentlarge v. Murphy*, 541 F.Supp.2d 421 (D.Mass.2008) (concluding that a person civilly committed was penalized under the Fifth Amendment where the person had to make incriminating statements in order to receive the benefit of rehabilitation treatment); *Bender v. New Jersey Dept. of Corrections*, 356 N.J.Super. 432, 812 A.2d 1154 (2003) (concluding that inmate could not be penalized with the denial of good time credits conferred by statute if the inmate declined to incriminate himself in therapy); *In re Lineberry*, 572 S.E.2d 229, 236 (N.C.Ct.App.2002) (addressing statutory presumption that a juvenile be released from secure custody pending

an appeal) ("In finding that juvenile's refusal to admit to the offenses was a factor justifying his continued custody pending appeal, the trial court exposed juvenile to the classic penalty situation of choosing between the privilege against self-incrimination and prolonged confinement.").

Here, Appellant's right secured by law was his statutory entitlement to obtain (or at least, be eligible for) transfer to the juvenile division without having to incriminate himself.

**13.** In *Jackson*, the Supreme Court held that the federal kidnapping statute, 18 U.S.C.A. § 1201, was unconstitutional. Under that statute, a jury could recommend the death penalty if it found a defendant guilty, but the statute did not impose the death penalty for those who pleaded guilty or who were tried before a judge. The Court found the death penalty provision unconstitutional because it discouraged defendants from seeking a jury trial and therefore imposed "an impermissible burden" on defendants who exercised their constitutional right to not plead guilty and demand a trial by jury. 390 U.S. at 572, 88 S.Ct. 1209. The Court concluded that the death penalty provision "needlessly penalize[d] the assertion of a constitutional right." *Id.* at 583, 88 S.Ct. 1209.

In *People v. Michael A.C.*, 27 N.Y.2d 79, 313 N.Y.S.2d 695, 261 N.E.2d 620 (1970), the New York Court of Appeals[14] struck down provisions of the Code of Criminal Procedure that required a defendant to waive a jury trial in order to receive the benefit of youthful offender treatment. The defendant signed the waiver and was tried in criminal court, albeit in a section designated as the Youth Part. Because the defendant waived his right to a jury trial, the defendant was considered a youthful offender, and thus, he was guaranteed a shorter prison sentence under statute. If the defendant did not consent to a non-jury trial, he would not have qualified for prosecution as a youthful offender and, consequently, would have been exposed to a considerably longer period of imprisonment.

Relying on *Jackson*, the New York Court of Appeals concluded that the statute impermissibly chilled a defendant's Sixth Amendment right to a jury trial. "Although any defendant, including a youthful offender, is free to consent to a trial without a jury if, in fact and reality, he prefers to be so tried—and knowingly waives his constitutional right—this does not mean that a State may demand that such a consent be given as an absolute precondition to affording him the benefits of youthful offender treatment." 313 N.Y.S.2d 695, 261 N.E.2d at 624. "For the evil in the [ ] statute is not that it necessarily coerces ... jury waivers but simply that it needlessly encourages them. A procedure need not be inherently coercive in order that it be held to impose an impermissible burden upon the assertion of a constitutional right." *Id.,* 313 N.Y.S.2d 695, 261 N.E.2d at 625 (quoting *Jackson,* 390 U.S. at 583, 88 S.Ct. 1209)

(emphasis in original). For these reasons, the court in *Michael A.C.* concluded that the provisions of the Criminal Code of Procedure were unconstitutional because they needlessly encouraged a defendant to exchange his rights to a jury trial for youthful offender treatment and a lesser sentence.

Here, by finding that Appellant had to admit guilt or accept responsibility for his actions as a condition to proving that he was amenable to treatment, the trial court placed Appellant in a situation that needlessly encouraged Appellant to sacrifice his Fifth Amendment rights against self-incrimination. As a result of the choice posed by the trial court, Appellant could either incriminate himself and possibly receive transfer to the juvenile system or not incriminate himself and face trial in the criminal system. In order for Appellant to obtain transfer to juvenile court and receive a lesser sentence for the same offenses, Appellant, similar to the defendant in *Michael A.C.*, would have to forego his constitutional rights. Consequently, the trial court's application of 42 Pa.C.S.A. § 6355(a)(4)(iii)(G) encourages a juvenile to exchange his/her rights against self-incrimination for the possibility of receiving transfer to the juvenile system and a lesser sentence.

Although the Commonwealth has a legitimate interest in determining whether a defendant is amenable to treatment in the juvenile system, it was not necessary, as a matter of statutory construction, for Appellant to make an incriminating statement to prove that he was capable of rehabilitation. By its plain language, 42 Pa.C.S.A. § 6355(a)(4)(iii)(G) and (G)(VII) do not mandate that Appellant admit guilt, accept responsibility or discuss the details of the

**14.** The Court of Appeals of New York is the highest appellate court in the state of New York.

facts underlying the charged crimes. In interpreting a similar statutory provision, the New Jersey Superior Court explained:

> [T]he [transfer] statute requires only that the juvenile prove, by whatever means chosen, the 'probability of rehabilitation' before age nineteen, utilizing the resources available to the court.... We are not convinced that in all cases a juvenile can meet the burden of proof only by admitting wrongdoing. The particular facts of each case determine the nature of the proofs. Generalizations are not particularly useful. Evidence demonstrating the probability of rehabilitation may be presented by a juvenile or witnesses without necessarily admitting guilt. There could be testimony by experts that the juvenile has the ability and inclination to comply with the law, wishes to do so, and will probably do so in the future if guided through a particular program of education and counseling; testimony by psychiatric experts that even *if* the juvenile is guilty of the offenses charged, that juvenile is not likely to repeat the aberrant behavior ...; and testimony of teachers, counselors, and clergy that the juvenile has displayed good character and maturity in the past and will likely do so in the future, if given proper training and guidance.

*State in Interest of A.L.,* 271 N.J.Super. 192, 638 A.2d 814, 822 (1994) (emphasis in original).

Likewise, the court in *Wayne W.* observed:

> There are other sources of probative evidence available ... bearing on [the juvenile's] amenability to treatment, that may be introduced without implicating the privileges against self-incrimination. These include, but are not limited to records of past treatment, school and probation records, Department of Youth Services records, Department of Social Services records, and testimony by a probation officer, Department of Social Services or Youth Services employees, teachers, friends, or family members.

606 N.E.2d at 1331.

The trial court, therefore, improperly applied 42 Pa.C.S.A. § 6355(a)(4)(iii)(G) in a way that conditioned transfer to juvenile court upon Appellant's waiver of his Fifth Amendment rights against self-incrimination, even though it was not necessary according to the plain language of the statute. In other words, the objective of 42 Pa.C.S.A. § 6355(a)(4)(iii)(G)—to determine whether Appellant is amenable to treatment—can be accomplished without requiring Appellant to provide self-incriminating information. Consequently, at the very least, the trial court construed 42 Pa.C.S.A. § 6355(a)(4)(iii)(G) as needlessly encouraging Appellant to make a self-incriminating statement in order to be considered for decertification. In so doing, the trial court excessively burdened or "chilled" Appellant's Fifth Amendment rights. We conclude, accordingly, that the trial court committed an error of law when it applied 42 Pa.C.S.A. § 6355(a)(4)(iii)(G) in a manner that not only compelled Appellant to admit guilt, but also chilled Appellant's rights against self-incrimination.

The Commonwealth, nonetheless, urges this Court to affirm the trial court's order for a variety of reasons.

In its brief, the Commonwealth first points out that in *Commonwealth v. Archer,* 722 A.2d 203, 207 (Pa.Super.1998) (*en banc*), and *Commonwealth v. Leatherbury,* 390 Pa.Super. 558, 568 A.2d 1313, 1315–16 (1990), this Court concluded that a trial court could consider a defendant's lack of remorse in determining whether a defendant is amenable to treatment. We do not find *Archer* or *Leatherbury* instructive or controlling because a Fifth Amend-

ment claim was not presented in those cases, and *Archer* and *Leatherbury* in no way addressed a juvenile's rights against self-incrimination.

The Commonwealth also contends that Appellant's Fifth Amendment rights were not violated because the presumption of innocence is not applicable to decertification hearings, and "the trial court may assume that the juvenile committed the alleged offense for purposes of the [decertification] proceeding." Commonwealth's Brief at 20 (citing, *inter alia*, *United States v. Juvenile LWO*, 160 F.3d 1179, 1181 n. 1 (8th Cir.1998)) ("A district court may assume the truth of the alleged offense at a transfer hearing").

■ Consistent with our discussion above permitting a psychiatrist to presume a juvenile's guilt in determining amenability to treatment, we conclude that for purposes of analyzing the factors in § 6355(a)(4)(iii), a trial court may (but need not) assume that the juvenile is guilty and committed the alleged acts constituting the offense. Nonetheless, there is a major difference between a trial court *assuming* that a juvenile is guilty and *requiring* a juvenile to openly admit guilt. The former is a necessary justification to address the factors in § 6355(a)(4)(iii)(A)-(E),[15] *see United States v. Miguel*, 338 F.3d 995, 1003 n. 23 (9th Cir.2003), while the latter is a violation of the juvenile's Fifth Amendment rights against self-incrimination if used to establish any factor. In short, the Commonwealth's argument focuses on the presumption of innocence inherent in the Fifth Amendment, and is misplaced because Appellant's claim does not involve the presumption of innocence. Rather, the core of Appellant's argument is compelled self-incrimination, a matter entirely divorced from the presumption of innocence. The Commonwealth's contention therefore misses the mark, and cannot serve as a basis upon which to affirm the trial court's order.

Finally, at oral argument, the Commonwealth argued that Appellant waived his Fifth Amendment rights against self-incrimination because Appellant failed to assert it at the psychiatric evaluation with Dr. O'Brien. The Commonwealth also contended that Appellant waived his Fifth Amendment rights against self-incrimination because Appellant hired Dr. Heilbrun to conduct a psychological evaluation. We find no merit in the Commonwealth's contentions.

■ First, Appellant did not incriminate himself in his interview with Dr. O'Brien, and thus, it was unnecessary for him to invoke his Fifth Amendment rights at that time. It was not until the trial court's decision and order that Appellant's Fifth Amendment rights were placed into jeopardy, when the trial court penalized Appellant (after-the-fact) for failing to admit guilt or accept responsibility for his actions and provide incriminating information. Since the trial court's decision subjected Appellant to the classic "penalty situation," Appellant's privilege against self-incrimination became self-executing, and Appellant need not have formally asserted the privilege at a prior time to claim

---

**15.** To recapitulate, these factors are: (A) the impact of the offense of the victim or victims; (B) the impact of the offense on the community; (C) the threat to the safety of the public or any individual posed by the child; (D) the nature and circumstances of the offense allegedly committed by the child; (E) the degree of the child's culpability. *Id.*

The juvenile, of course, can contest the weight and reliability of the Commonwealth's evidence of his guilt at the decertification hearing in an attempt to demonstrate a lesser state of culpability under the factors in § 6355(a)(4)(iii)(A)-(E). *See In re Sealed Case*, 893 F.2d 363, 369 (D.C.Cir.1990).

its protections. *See Brown,* 182 P.3d at 1210–11 (discussing *Murphy* and *Lefkowitz* ).

Second, Appellant did not waive his rights against self-incrimination by virtue of the fact that he hired Dr. Heilbrun to conduct a psychological evaluation. We are aware that the courts in *Davis* and *Wayne W.* held that once a juvenile presents expert psychiatric testimony on his/ her behalf, the court can order the juvenile to submit to an examination by a psychiatrist hired by the state without violating the juvenile's Fifth Amendment rights. *See Davis,* 998 P.2d at 1136; *Wayne W.,* 606 N.E.2d at 1332. The rationale behind these cases is that because the juvenile chose to present expert testimony, the juvenile is deemed to have waived his Fifth Amendment right to remain silent, and any statements that the juvenile made to the state's psychiatrist is admissible into evidence at the transfer/decertification hearing. *See id.*

We conclude, however, that *Davis* and *Wayne W.* are distinguishable on their facts.

Here, Appellant willingly submitted to an examination by the Commonwealth's expert, Dr. O'Brien. Appellant did not make incriminating statements to Dr. O'Brien, and consequently, Dr. O'Brien's testimony at the decertification hearing did not relay any incriminating statements made by Appellant during the evaluation. While the courts in *Davis* and *Wayne W.* concluded that a juvenile's *affirmative* statements to a state psychiatrist were admissible because the juvenile waived his/ her Fifth Amendment right to remain silent, the trial court here, in contrast, focused on Appellant's *failure* to provide incriminating statements to Dr. O'Brien to penalize Appellant's Fifth Amendment rights against self-incrimination.

Under *Davis* and *Wayne W.,* when a juvenile admits psychiatric evidence on his behalf, a court can order the juvenile to submit to a psychiatric evaluation with the state's psychiatrist without violating the juvenile's Fifth Amendment right to remain silent. Although a juvenile, in the proper circumstances, may be compelled to speak to a state psychiatrist and answer questions, a juvenile cannot be compelled to admit guilt or accept responsibility when the juvenile asserts his innocence in response to the questions. *Cf. Christopher P.,* 816 P.2d at 487–89 (recognizing that a court can compel a juvenile to undergo a psychiatric evaluation but concluding that the in no circumstances can the juvenile be compelled to discuss the alleged offenses with the psychiatrist). That is exactly what happened in this case: Appellant asserted his innocence before Dr. O'Brien, and instead of accepting responsibility or admitting guilt, Appellant answered the questions in a non-incriminating manner. Therefore, *Davis* and *Wayne W.* are procedurally inapposite, and do not lend credence to the Commonwealth's position. As explained above, the trial court's subsequent order and application of the law subjected Appellant to the classic penalty situation, and Appellant properly preserved his Fifth Amendment claim.

We, accordingly, find no merit in the Commonwealth's arguments.

In conclusion, under Pennsylvania law, the issue of whether a juvenile is amenable to treatment is a factor that must be considered by the trial court. As noted above, "[w]hen a juvenile seeks to have his case transferred from the criminal division to the juvenile division, he must show that he is in need of and amenable to treatment, supervision or rehabilitation in the juvenile system." *Johnson,* 669 A.2d at 321.

Here, the trial court found that Appellant failed to establish amenability to treatment based on the fact that Appellant did not admit guilt or accept responsibility for his actions. The trial court's reliance on this impermissible factor violated Appellant's Fifth Amendment rights, and tainted the entire decertification proceedings.

In the absence of this inappropriate, unconstitutional consideration, it is quite possible that the trial court could have arrived at a different conclusion and found that Appellant met his burden of proving amenability to treatment. During the decertification proceeding, Appellant adduced evidence favorable to his cause on other factors listed in 42 Pa.C.S.A. § 6355(a)(4)(iii), and we are unable to determine from the record before us the weight given by the trial court to this evidence. The only other factor explicitly relied upon by the trial court to reach its decision was the serious nature of the offense. However, this Court cannot speculate as to the weight the trial court would have afforded this factor had it found that Appellant was amenable to treatment.

It is clear from our review of the record that a pivotal component of the trial court's analysis rested on an unconstitutional basis. Because the decertification issue is for the trial court to decide in the first instance, within its discretion, we vacate the order denying decertification and remand for a new decertification hearing. Cf. Commonwealth v. Bethea, 474 Pa. 571, 379 A.2d 102, 106–07 (1977) (concluding that a sentence must be vacated where "it reasonably appears from the record that the trial court relied in whole or in part upon [an unconstitutional] factor" in imposing a harsher sentence, and the harsher sentence amounted to a penalty for the exercise of a constitutional right; the sentence must be vacated even though the trial judge considered other permissible factors as well); cf. also Commonwealth v. Goldhammer, 512 Pa. 587, 517 A.2d 1280, 1283–84 (1986) (stating that where this Court vacates a conviction in a multiple count appeal, and vacating the conviction upsets the trial court's overall sentencing scheme, this Court must remand for resentencing because sentencing lies within the sole discretion of the trial court).

For the above-stated reasons, we vacate the trial court's order and remand for a new decertification hearing. Further, we leave it to the trial judge to determine whether, upon remand, the prospective decertification hearing shall be heard by another judge.

Order vacated. Case remanded. Jurisdiction relinquished.

Judge COLVILLE files a Dissenting Opinion.

DISSENTING OPINION BY COLVILLE, J.:

Despite the fact that Appellant's right against self-incrimination was arguably in jeopardy before and during the transfer hearing, he failed to timely assert that right or otherwise raise an objection citing that right. Consequently, in my view, Appellant has waived the Fifth Amendment issues he wishes this Court to review, which are the sole issues presently before us. I, therefore, dissent.

At the transfer hearing, Appellant's expert witness, Dr. Heilbrun, testified that, during his examination of Appellant, he asked Appellant whether he shot Kenzie Houk. Dr. Heilbrun stated that Appellant claimed he did not commit the shooting. When the Commonwealth questioned Dr. Heilbrun regarding the effect Appellant's denial would have on the treatment plan or the possibility of recidivism, Dr. Heilbrun ultimately concluded that, if Appellant is

found guilty and continues to deny culpability, "then that's a problem for treatment." N.T., 01/29/10, at 40. Appellant's counsel did not object to the Commonwealth's questions or to Dr. Heilbrun's answers.

The Commonwealth also called an expert witness at the hearing, Dr. O'Brien. Dr. O'Brien testified that he conducted a psychiatric evaluation of Appellant in the presence of Appellant's counsel. According to Dr. O'Brien, during that evaluation, he asked Appellant whether he was responsible for the shooting, and Appellant said no. Dr. O'Brien further testified that Appellant's refusal to discuss the factual allegations regarding the shooting is consistent with his history of not taking responsibility for his wrongdoings. The doctor opined,

> His avoidance of discussing the factual allegations responsible for his detention was consistent with what appeared in his record from the Thomas Center and also from his school records in terms of his not taking responsibility for things that he was caught doing.

> And so that was consistent and that was something that was—that was noteworthy to me, only in that it was a consistency, that he is—he tends to avoid or reacts by avoiding taking responsibility, which, in my opinion, complicates the—the process of rehabilitation, because—and I agree with Dr. Heilbrun in this—that in order to be rehabilitated as a result of a conviction for a serious crime, you have to take responsibility for your behavior and then you have to allow yourself to go through the process of analyzing with a professional the underpinnings to your behavior and understanding those underpinnings and understanding what went wrong or what happened that resulted in the various array of things that were happening at

the time of the offense to result in such a deviant type of behavior.

N.T., 03/12/10, at 29–30.

Later in Dr. O'Brien's testimony, when he was asked about Appellant's amenability to treatment, Dr. O'Brien made the following conclusions:

> Well, again, as I said, it's my opinion that he doesn't have an illness that needs to be treated in a strictly mental illness sense, so he doesn't require treatment of that sort. His amenability to rehabilitation, in my opinion, is very limited because of his—the various different factors I talked about, the tendency to minimize, to deny, to shift the blame and the—basically the posture that he's in in connection with this case and the lack of incentive to ever actually come forward. The more support he gets, actually, the less likely he is to come forward, because it sort of—it makes it even more impossible for him to come forward and say, actually, you know, I did this and I'm sorry. And so I just don't see—I don't see any indication that that's a likely outcome, and if you don't have that outcome, then you haven't taken the first step toward rehabilitation.

*Id.* at 36–37.

There is nothing of record which suggests that Appellant's counsel objected to any questions Dr. O'Brien posed to Appellant during the doctor's evaluation of Appellant. Furthermore, Appellant's counsel never objected on Fifth Amendment grounds to any question asked of Dr. O'Brien or to any answer he provided.

The certified record demonstrates that, with counsel present, the Commonwealth's expert witness directly asked Appellant whether he committed the crimes for which he was charged. The record further evinces that the hearing was fraught with references to Appellant's unwillingness to

admit to committing the crime and the effect of this unwillingness on his amenability to treatment. Yet, at no time during his examinations or the transfer hearing did Appellant assert his constitutional right against self-incrimination, nor did Appellant's counsel object, citing a violation of Appellant's right against self-incrimination, to any questions posed by the Commonwealth or answers provided by witnesses. Instead, Appellant waited until he filed his post-hearing brief in support of his petition to decertify to inject into the matter issues regarding his right against self-incrimination.

In that brief, Appellant maintained that Dr. O'Brien's conclusions concerning Appellant were "based on an overriding concern and belief that unless the juvenile confesses, he cannot be counseled, treated, or rehabilitated." Brief in Support of Appellant's Petition to Decertify, 03/19/10, at 11. Appellant later stated, "There is no legal basis for the [c]ourt to consider Dr. O'Brien's assumption that unless a child confesses, the juvenile justice system is not an appropriate system for the case." *Id.* at 12. Appellant then baldly asserted,

The Fifth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, is a fundamental right. To conclude that unless a juvenile confesses, he must be treated as an adult, places an impossible burden on a juvenile, his counsel, and any adult advising the child. In this case, the prosecution would have this [c]ourt believe that a juvenile, whether innocent or not, must confess if charged with a serious crime such as murder or be subjected to adult punishment, in this case life imprisonment without the possibility of parole. A conclusion of this nature is a clear violation of the Fifth Amendment to the United States Constitution, Article 1 § 9 of the Pennsylvania Constitution, and

the very concept of our system of justice.

*Id.* at 13.

Contrary to Appellant's argument, a legal basis **did** exist for the trial court to consider Dr. O'Brien's testimony regarding Appellant's history of being unwilling to take responsibility for his wrongdoings and the effect that unwillingness has on Appellant's amenability to treatment. Simply stated, Dr. O'Brien's testimony in this regard was unobjected-to evidence of record. If Appellant believed Dr. O'Brien's testimony was offensive to his right against self-incrimination, then Appellant should have lodged a timely objection or asserted his right against self-incrimination. Because he did neither, Appellant waived any issues concerning this right. *See Commonwealth v. Baumhammers*, 599 Pa. 1, 960 A.2d 59, 73 (2008) ("It is axiomatic that issues are preserved when objections are made timely to the error or offense.").

Citing to a case from the Supreme Court of Kansas, *State v. Brown*, 286 Kan. 170, 182 P.3d 1205 (2008), the Majority concludes that Appellant did not waive his Fifth Amendment issues. The Majority opines,

Since the trial court's decision subjected Appellant to the classic "penalty situation," Appellant's privilege against self-incrimination became self-executing, and Appellant need not have formally asserted the privilege at a prior time to claim its protection.

Majority Opinion at 508–09 (citing *Brown*, 182 P.3d at 1210–11). I am unable to agree with this opinion.

As an initial matter, I disagree with the manner in which the Majority characterizes the trial court's decision. More specifically, I cannot agree with the Majority's conclusion that the trial court required

Appellant to admit that he committed the shooting in order to demonstrate that he is amenable to treatment and capable of rehabilitation. The essence of the trial court's determination regarding Appellant's amenability to treatment is evidenced by the following passage from the court's opinion:

> Thus, from both expert witnesses we find agreement on the conclusion that rehabilitation requires taking responsibility for the underlying offense; and, persuasive reasoning from [the Commonwealth's expert] that taking responsibility is unlikely to occur, thus making the prospects of rehabilitation within the confines of juvenile court jurisdiction likely to be unsuccessful.

Trial Court Opinion, 03/29/10, at 15.

In my view, this statement does not demonstrate that the trial court applied 42 Pa.C.S.A. § 6355(a)(4)(iii)(G) in a way that violated Appellant's right against self-incrimination. Instead, in assessing Appellant's amenability to treatment, the court determined as matters of fact that: (1) taking responsibility for an underlying offense is of paramount importance to treatment and rehabilitation; (2) Appellant has yet to take responsibility for the shooting; and (3) given Appellant's history of failing to take responsibility for his wrongdoings, treatment and rehabilitation were not likely to succeed in Appellant's case. These findings of fact are supported by the record. As I noted above, Dr. Heilbrun testified that Appellant's continued denial of culpability for the shooting if he is found guilty would be a problem for treatment. Furthermore, Dr. O'Brien testified that Appellant had a history of not taking responsibility for his wrongdoings, which, according to the doctor, limits his amenability to treatment.

Lastly, I am unable to conclude that this case presents a "classic penalty situation."

Using *Brown* as the standard, I first note that "[t]he general rule is that an individual must affirmatively assert his or her right against self-incrimination or else the law will consider the individual to have waived the right." *Brown*, 182 P.3d at 1210 (citing *Minnesota v. Murphy*, 465 U.S. 420, 429, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984)). "Some exceptions to this general rule exist, and there are situations where the right against self-incrimination is 'self-executing.'" *Brown*, 182 P.3d at 1210 (citing *Murphy*, 465 U.S. at 429–34, 104 S.Ct. 1136). The right against self-incrimination may be "self-executing" when a "classic penalty situation" has occurred. *Brown*, 182 P.3d at 1210.

In a "classic penalty situation," the State threatens a person with punishment if that person asserts or desires to invoke his or her right against self-incrimination. *See U.S. v. Warren*, 338 F.3d 258, 264 (3rd Cir.2003) ("The Supreme Court has decided a string of so-called 'penalty' cases that hold that the government may not impose a penalty on a person for asserting his or her Fifth Amendment privilege."); *Brown*, 182 P.3d at 1210 ("In each of the so-called 'penalty' cases, the State not only compelled an individual to appear and testify, but also sought to induce him to forgo the Fifth Amendment privilege by threatening to impose economic or other sanctions 'capable of forcing the self-incrimination which the Amendment forbids.'") (quoting *Murphy*, 465 U.S. at 434, 104 S.Ct. 1136). If the threatened person succumbs to the State's pressure by incriminating himself, then the right is "self-executing" insomuch as "the constitutional privilege against self-incrimination may be asserted at a later time to suppress the statements made under State compulsion." *Brown*, 182 P.3d at 1210 (citing *State v. Evans*, 144 Ohio App.3d 539, 760 N.E.2d 909 (2001)).

Here, the trial court did not punish Appellant for invoking or stating a desire to invoke his right against self-incrimination. In fact, as I discussed above, there is no evidence of record that Appellant ever sought to invoke that right. Instead, consistent with Dr. O'Brien's testimony, the trial court considered Appellant's **denial of the shooting** to weigh negatively against his amenability to treatment because Appellant has a history of deflecting responsibility for his wrongdoings. Appellant was never threatened with a penalty if he chose to assert his right against self-incrimination. Moreover, Appellant has never asserted his right against self-incrimination in an attempt to suppress statements he made under State compulsion.

When Dr. O'Brien evaluated Appellant, Appellant's counsel was armed with the knowledge that the doctor would testify for the Commonwealth. Counsel nonetheless allowed Dr. O'Brien to directly question Appellant regarding his guilt in the shooting of Ms. Houk. Any questions Dr. O'Brien asked Appellant regarding his actions on the day of the shooting had the potential to elicit incriminating answers from Appellant. Yet, nothing of record demonstrates that counsel suggested to Appellant that he assert his right against self-incrimination. Moreover, counsel never objected at the hearing on the grounds that testimony violated, or had the potential to violate, Appellant's right against self-incrimination. The record before us is silent as to why counsel chose to allow this evidence into the record; we can only presume counsel believed this evidence would help carry Appellant's burden of proof. In any event, this silence has led me to conclude that Appellant failed to preserve the Fifth Amendment issues he presents to this Court.

This case has brought to my attention important and complex questions as to the interplay between the Fifth Amendment and the juvenile decertification and transfer process. For instance, the transfer and decertification process seems to benefit from a juvenile's willingness to submit to psychological or psychiatric evaluation. Yet, it is unclear to me whether a juvenile who cooperates with such a process is provided with adequate protection of the juvenile's fundamental right against self-incrimination. While the answer to this question is undoubtedly important, neither the question that would prompt such an answer nor any questions Appellant presents on appeal are properly before this Court.

For these reasons, I would affirm the trial court's order.